**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

**REBEKAH LANGFORD,**

            **Plaintiff,**

   **v.**

**DENIS McDONOUGH, Secretary of**
**Veterans Affairs,**

           **Defendant.**

**Case No. 21-cv-3724**

**Judge Jorge L. Alonso**

## <u>MEMORANDUM OPINION AND ORDER</u>

Defendant Denis McDonough, Secretary of Veterans Affairs ("Defendant"), has moved for summary judgment on plaintiff Rebekah Langford's ("Plaintiff") failure to accommodate, interference, and retaliation claims under the Rehabilitation Act, 29 U.S.C. § 791 *et seq*. Plaintiff asserts that Defendant violated the Rehabilitation Act by terminating her employment because of her request for a reasonable accommodation related to her Post-Traumatic Stress Disorder ("PTSD"). Defendant has also moved to dismiss Plaintiff's reasonable accommodation claim under Rule 12(b)(1) for lack of subject matter jurisdiction. Fed. R. Civ. P. 12(b)(1). For the reasons that follow, Defendant's motion to dismiss is granted as to Plaintiff's failure to accommodate claim. Summary judgment is granted in Defendant's favor as to Plaintiff's remaining claims.

## BACKGROUND

### A. Local Rule 56.1

Local Rule 56.1 outlines the requirements for the introduction of facts parties would like considered in connection with a motion for summary judgment. The Court enforces Local Rule 56.1 strictly. *See FTC v. Bay Area Bus. Council, Inc.*, 423 F.3d 627, 633 (7th Cir. 2005)

("Because of the important function local rules like Rule 56.1 serve in organizing the evidence and identifying disputed facts, we have consistently upheld the district court's discretion to require strict compliance with those rules."). At the summary judgment stage, a party cannot rely on allegations; he or it must put forth evidence. Fed. R. Civ. P. 56(c)(1)(A); *see also Grant v. Trs. of Ind. Univ.*, 870 F.3d 562, 568 (7th Cir. 2017) ("As the 'put up or shut up' moment in a lawsuit,' summary judgment requires a non-moving party to respond to the moving party's properly-supported motion by identifying specific, admissible evidence showing that there is a genuine dispute of material fact for trial."). Where one party supports a fact with admissible evidence and the other party fails to controvert the fact with citation to admissible evidence, the Court deems the fact admitted. *See Curtis v. Costco Wholesale Corp.*, 807 F.3d 215, 218-19 (7th Cir. 2015); *Ammons v. Aramark Unif. Servs., Inc.*, 368 F.3d 809, 817-18 (7th Cir. 2004).

This does not, however, absolve the party putting forth the fact of the duty to support the fact with admissible evidence. *See Keeton v. Morningstar, Inc.*, 667 F.3d 877, 880 (7th Cir. 2012). Statements not based on personal knowledge cannot be considered in determining whether there is a genuine issue of material fact. *Toro Co. v. Krouse, Kern & Co.*, 827 F.2d 155, 163 n.3 (7th Cir. 1987) ("Rule 56[(c)]'s requirement of personal knowledge is mandatory."). Purely argumentative allegations are disregarded. *Rivera v. Guevara*, 319 F. Supp. 3d 1004, 1018 (N.D. Ill. 2018) ("The court disregards the portions of the parties' Local Rule 56.1 submissions that make legal arguments and assert legal conclusions, which are not factual statements at all."); *Boyd v. City of Chicago*, 225 F. Supp. 3d 708, 716 (N.D. Ill. 2016) (nonmovant's statement of additional facts "must represent only material facts and are not the proper province of argumentative or conclusory allegations.").

In accordance with the law set forth above, to the extent Plaintiff fails to properly dispute any of Defendant's asserted facts, the Court deems those facts admitted. Furthermore, the Court will not consider Plaintiff's asserted facts that are purely argumentative or are not supported by deposition testimony, documents, affidavits, or other evidence admissible for summary judgment purposes. The facts set forth in the "Background" section are undisputed by the parties unless otherwise noted.

**B. FACTS**

**a. Plaintiff Begins Probationary Employment at Jesse Brown VA Medical Center**

Plaintiff Rebekah Langford began working as a Food Service Systems Dietitian ("FSD") at the Jesse Brown VA Medical Center (the "Medical Center") on June 9, 2019. The Medical Center is a 200-bed inpatient facility providing a full range of patient care services. The FSD has responsibilities relating to food production, service, and safety; menus; room service; dietetic software; quality management; and training. The FSD also provides professional support to the facility's Food Operations section and serves as the liaison to the clinical section of Nutrition and Food Service ("NFS"). A major duty of the FSD is planning and maintaining menus for regular and modified diets and special events, taking into consideration factors such as nutritional requirements, patient satisfaction, budget allocation, available manpower, and equipment limitations. The FSD performs regular inspections to ensure food safety and quality procedures are being followed.

Plaintiff's first line supervisor was Michelle Angarita, Food Operations Manager ("FOM"), and her second line supervisor was Laura Dolezal, Assistant Chief, NFS. Plaintiff's employment at the Medical Center was subject to an initial one-year probationary period, during which her supervisors were required to evaluate her performance and adjustment to the job, as well as any training or outstanding work that warranted attention. Plaintiff was also a bargaining-

unit employee subject to the collective bargaining agreement ("Master Agreement") between the

U.S. Department of Veterans Affairs ("VA") and the American Federation of Government

Employees ("AFGE").

### b. Plaintiff Requests to Change Her Schedule

The Medical Center hired Plaintiff to work daily from 9:00 a.m. to 5:30 p.m., which the

VA terms a "tour of duty" ("TOD"). On September 5, 2019, Plaintiff approached Angarita to

request a change in her TOD to 8:00 a.m. to 4:30 p.m. Angarita suggested they meet with

Dolezal and Jolie Rubin-Lewis, the Chief of the Service, and Plaintiff was asked to put her

request into writing. Plaintiff did so that same day, writing in pertinent part as follows:

> I am officially requesting a change to my Tour of Duty. My son was recently
> diagnosed with a [seizure disorder] and his doctor and special needs daycare have
> asked that I change my work hours to better accommodate his medical and
> development needs. Letters from the pediatrician and the daycare center's director
> are enclosed with this letter for your review.
>
> I am currently scheduled to work 9:00-5:30pm. I would like to request my
> new Tour of Duty to be 8:00am-4:30pm. I have considered my current duties and
> responsibilities, and I believe this change of just one hour will still allow me to
> complete my necessary job tasks without any undue hardship to our service.
> Additionally, I discussed this with the AFGE Union President who offered guidance
> as well.

On September 11, 2019, Angarita issued a memorandum to Plaintiff describing Plaintiff's

request as a schedule change "for work-life balance purposes." The memorandum permits "a

three month-trial schedule change [from 8am-4:30pm] will be implemented to determine if the

schedule change does meet[] the needs of the Service and veterans served[.]" The three-month

trial period was set for September 15, 2019 until December 14, 2019, at which time "the

schedule change will be reviewed and a permanent schedule will be put into place." The

memorandum further required the following "accommodations" from Plaintiff during the three-

month trial period: "coverage for planned leave of the Education, Staff/Development and

4

Performance Improvement Dietitian, ability to attend and/or provide training for evening staff members, and ability to attend evening meetings. . . . As much notice as possible will be provided in these cases." Plaintiff did not sign the memorandum, disagreeing with the evening requirements.

On September 27, 2019, Plaintiff met with Angarita, Dolezal, Rubin-Lewis, AFGE steward Joseph Ferguson, and Human Resources ("HR") staff Megan Castillo and again requested a change in her TOD. The parties submit conflicting affidavits regarding what was discussed at that meeting. On the one hand, Ferguson and Plaintiff declare that Plaintiff explained that she was suffering a mental health crisis, for which she was seeking professional help, because of what her son was going through as well as domestic violence that she was experiencing at home. On the other hand, Angarita declares that Plaintiff only discussed her son's medical conditions and difficulties with his childcare due to scheduling and her financial situation, and that she was separated from her husband. Angarita maintains that Plaintiff did not raise the domestic violence or personal medical issues she was experiencing, and that Plaintiff did not say that she was seeking treatment for mental health issues.

On October 4, 2019, Angarita issued another memorandum to Plaintiff, stating that Plaintiff's TOD was temporarily changed per her request to 8:00 a.m. to 4:30 p.m. through January 4, 2020. The memorandum also stated that Plaintiff's "position description will not change," the "primary functions of this assignment will remain the same," and "[a]ny requests for leave should be made to [Angarita], in accordance with established leave policies and procedures." The memorandum set forth four dates on which Plaintiff would need to work from 9:00 a.m. to 5:30 p.m. due to another dietician's planned leave. The memorandum encouraged Plaintiff to "take advantage" of the Employee Assistance Program ("EAP"), as well as certain

HR Assistants, for "child care assistance." The EAP does not handle accommodations, and no one began the reasonable accommodation process or mentioned it to Plaintiff at that time. The VA's reasonable accommodation process does not require a formal, written request for an accommodation.

### c. Plaintiff's Absences and Performance Issues

Between September and December 2019, there were multiple instances when Angarita and Plaintiff discussed Plaintiff's failure to carry out one or more of her required duties.

On September 18, 2019, Plaintiff failed to submit an order with an important food vendor on time, even though such orders are the responsibility of the FSD. Angarita discussed the issue with Plaintiff and authored a written report of contact documenting the incident. Although Plaintiff does not dispute that Angarita authored that report at that time, Plaintiff contends she never received it, nor any of the others that subsequently followed.

Ensuring the meal menus for the month are correctly entered into a software system called Computrition is a responsibility of the FSD. On October 5, 2019, Angarita reported that she received a call from Food Service Supervisor Wanda Mayes, who stated that "the call center" had identified there were no menus in Computrition for the next day. Plaintiff maintains that she did not fail to enter the menus, although it is undisputed that the menus were not in Computrition. When Angarita reached out to Plaintiff, Plaintiff showed Angarita Plaintiff's checklist noting the menus were completed and offered to come in to clear up any confusion. Angarita declined, and Ms. Mayes entered the menus so that there was no service disruption in the patients' meals. It is disputed whether Ms. Mayes worked on her day off to do so. Angarita discussed the issue with Plaintiff and authored a written report of contact on October 7, 2019. Angarita reported that when she asked how the incident happened, Plaintiff replied that another

dietician typically sent her calendar reminders for the monthly entering of menus, and that there was no reminder for October.

Next, completion of daily "Smart Subs" reports is the responsibility of the FSD. Smart Subs are special substitution meals and items for specific patients due to dietary restrictions or other reasons. On October 8, 2019, Angarita authored a report of contact that states that the evening prior, the Smart Subs form "was not in its usual location which is on the kiosk desk." Angarita reported checking Plaintiff's desk for the Smart Subs report and then texting her. Plaintiff had sent an email to two call center employees indicating that there were no Smart Subs to report and so they would not "find any paperwork in the smart subs bin." Angarita reported requesting that Plaintiff continue the normal procedure of placing the report on the kiosk so that all employees could look at it and confirm it was completed, and in case the particular call center employees switched their shifts or were unable to report to work that day. Plaintiff contends that there was nothing to report, and that at some point in October, call center employees began generating the Smart Subs reports.

On November 4, 2019, Angarita issued to Plaintiff a letter of counseling related to Plaintiff's leave usage. Angarita stated in the letter that for the period of June 9, 2019, through November 4, 2019, Plaintiff used "26:30 hours of annual leave, 3 hours of compensatory time, and 40 hours of sick leave." The letter further noted that "this is an excessive amount of leave for an employee who started less than 6 months ago," that Plaintiff's "absence from duty has had an adverse impact upon the operational efficiency of this service," and that it was an "indication of sick leave abuse" which may require "medical documentation to support future absences[.]" The letter "emphasize[s] [Plaintiff's] need . . . to take steps to improve [her] attendance" and that lack of improvement in leave usage "could lead to removal during [her] probationary period." The

letter again refers Plaintiff to the EAP and states "[t]here is no charge to leave for an initial EAP appointment." Although Plaintiff maintains that she told Angarita about her mental health issues on September 27, Angarita declares that she was not aware of them, or of Plaintiff's disability or any request for accommodation, until December 19, 2019.

Despite the letter of counseling, that same day Angarita signed a performance review for the period covering June 9, 2019, to September 30, 2019, rating Plaintiff as "Fully Successful" for each of the reviewed elements: Hazard Analyst Critical Control Point, Menu Management, Computrition, Nutrition and Food Service Safety/Security, Program Support/Customer Service, and Purchase Card. Angarita did not identify any deficiencies in Plaintiff's performance on that review. Plaintiff received the review on November 22, 2019.

On October 22, 2019, Angarita designated Plaintiff as one of two individuals who would function as FOM in Angarita's absence. Plaintiff acted as FOM on October 23 and 28, 2019, December 4, 2019, and February 19, 2020.

Plaintiff continued to take large amounts of leave. From November 4, 2019, to December 30, 2019, Plaintiff used an additional 18.5 hours of annual leave, 12.5 hours of sick leave, and two hours of compensatory time. All told, between June 9, 2019, and December 30, 2019, Plaintiff used a total of 45 hours of annual leave, 52.3 hours of sick leave, and five hours of compensatory time. Plaintiff took most of this leave before her PTSD diagnosis. During the three-month period of the temporary change in her TOD, Plaintiff took 53.45 hours of leave, including 27 hours of annual leave and 24 hours of sick leave. There is no dispute that Angarita had approved the majority of the leave that Plaintiff requested.

There also continued to be instances where Plaintiff failed to adequately perform certain FSD duties. Tracking food services workers' fit testing—an annual requirement to ensure VA

employees are physically capable of performing their jobs—is the responsibility of the FSD. Plaintiff monitored their testing, training, and reporting requirements, and sent out emails where she found deficiencies, although she disputes that she was responsible for "ensuring" their compliance as she was not their supervisor. In any event, in November 2019, food service workers were deficient in completing their testing, and Angarita met with Plaintiff on November 7, 2019, to discuss the issue. Angarita authored a report of contact that same day, which reported that she and Plaintiff pulled up the electronic file that Plaintiff used for keeping track of employee's fit testing and that it had not been updated. Angarita reported telling Plaintiff about the importance of staying on top of this duty to ensure the safety of the staff.

On November 11, 2019, Langford incorrectly entered the Veteran's Day menu into the software system, although it is disputed whether this led to kitchen confusion and food waste. Angarita discussed the issue with Plaintiff and authored a written report of contact dated November 11, 2019.

Defendant contends that the FSD was expected to attend a weekly huddle meeting to facilitate direct communication between the food services supervisors and the FSD. Plaintiff disputes that the huddle meetings were mandatory and contends that they were not implemented until she requested a TOD change in September. In any event, Plaintiff emailed Angarita on November 14, 2019, stating she would not be attending the huddle the coming Friday because she would be preparing for a training. She then sent an email stating she could in fact attend the huddle, but ultimately did not show up. Angarita authored a report of contact on November 18, 2019, stating that Plaintiff did not attend the huddle meetings that day or the week prior, and that Plaintiff indicated she had forgotten about the huddle the week before.

The parties submitted conflicting affidavits as to two additional events: whether Plaintiff failed to ensure the month's menus were correctly entered into Computrition on November 30, 2019, causing additional staff members to have to work on their day off to correct the issue; and whether Plaintiff failed to timely complete the Smart Subs report on December 6, 2019. It is also disputed whether Plaintiff and Angarita established a deadline of November 29, 2019, for Plaintiff to complete Contracting Officer Representative II ("COR II") training. There is no dispute that COR II training was discussed on October 23, 2019, that it was not completed by December 13, 2019, and that on that date Angarita requested weekly updates on the training status going forward. However, Plaintiff now declares that the training was not mandatory and in fact she was not eligible for it because she had not been a COR I for one year, although there is no evidence that the parties knew or discussed those facts at the time. It is undisputed that on December 27 Plaintiff had not completed the training, and that Angarita emailed to Plaintiff a detailed schedule for its completion in increments by January 21, 2020.

There are no reports of contact in the record regarding these three events, although they were memorialized, among other events (including several of those incidents described above), in an email from Angarita to Plaintiff dated December 19, 2019, regarding "a summary of the issues we discussed at this afternoon's . . . meeting." There is no dispute that that meeting took place and that the listed topics were discussed.

Although Plaintiff did not understand the above conversations with Angarita to be discussions about her performance, she does not dispute that the incidents, discussions, and meetings set forth in this section took place (other than where specifically noted).

10

### d. Angarita Proposes to Terminate Plaintiff's Employment

On December 16, 2019, at 9:18 a.m., Plaintiff sent an email to Angarita, Dolezal, Lewis-Rubin, and Hoffman with the subject line "December Monthly Inspection," stating that Plaintiff had a doctor's appointment that she needed to leave for at 10:45 a.m. and asking whether it would be alright to start "this" at 9:45 a.m. Angarita emailed Dolezal at 5:26 p.m. seeking feedback on an attached draft memorandum, which proposed to terminate Plaintiff from her probationary position based on listed instances of "abuse of leave, careless or negligent workmanship, unauthorized disclosure of information obtained as a result of [employment] in the VA, and willful resistance to supervisor's request for increased communication." Dolezal responded on December 18, stating in part, "I think we need to discuss this with Jolie. I don't see anywhere on your FOM weekly report about this, nor was it discussed at yesterday's manager's meeting. I want to make sure she is aware this is what you are working on and supports the recommendation." Dolezal also suggested edits to the formatting of the memorandum and an additional instance to add to the list.

### e. Plaintiff Is Diagnosed with PTSD and Submits a Written Reasonable Accommodation Request and Union Grievance

On December 15, 2019, Plaintiff was diagnosed with PTSD, for which she receives therapy and medication. Shortly thereafter—the record is silent as to a precise date—Plaintiff contacted Castillo and Ferguson about Plaintiff's need for long-term or permanent accommodations. Castillo and Ferguson directed Langford to the Local Reasonable Accommodation Coordinator ("LRAC"), Christopher Glover.

Plaintiff emailed Glover on December 19, 2019, cc'ing Castillo and Ferguson, informing Glover that Plaintiff spoke to HR and the union, that she had PTSD and anxiety, and that she needed accommodations to avoid triggering her conditions. Plaintiff told Glover that her request

11

was time-sensitive as the change of her TOD was due to expire on January 4, 2020. Plaintiff also asked about the availability of an interim accommodation. Glover responded that same day, saying he would send Plaintiff the VA form used to document an accommodation request. Plaintiff and Ferguson met with Glover at some point thereafter, and Glover said that Plaintiff's request was going to be hard to deny because the VA took PTSD seriously.

On December 21, 2019, Plaintiff returned the form, indicating that she was requesting a continuation of her 8:00 a.m. to 4:30 p.m. TOD and a quiet, smaller office space with zero to two other occupants. Plaintiff stated that her requests would allow her to provide care for herself, meet her medical needs, allow her to focus, and allow her to complete tasks.

On December 23, 2019, Glover asked for medical documentation substantiating Plaintiff's condition because it was not obvious. Glover received a signed form from Plaintiff's treating physician on January 3, 2020, and eventually more detailed information on January 21, 2020. On the January 3 form is a typed section header stating, "Your patient Rebekah Langford has requested an accommodation (*describe the requested accommodation here*)." The following is typed below: "Tour of Duty Change 8:00am to 4:30pm, quiet smaller office space with 0-2 other inhabitants." Below the typed information are the following handwritten notes: "Flex Schedule, additional breaks PRN[,] telework option (W+F)[,]" and a curved line connecting the typed word "office space" to the handwritten note "w/ ability to close door." Also handwritten on the form are notes that Plaintiff "needs to continue w/ 8-4:30 [schedule] to allow her to receive + maintain medical treatment + avoid constant triggers."[1]

---

[1] Defendant contends that the handwritten notes are not admissible because they have not been authenticated and they are hearsay. *Bombard v. Fort Wayne Newspapers, Inc.*, 92 F.3d 560, 562 (7th Cir. 1996) ("a party may not rely upon inadmissible hearsay . . . to oppose a motion for summary judgment."). Assuming, *arguendo*, that the notes are admissible, they do not save Plaintiff's retaliation claim for the reasons explained in the "Discussion" section below.

Plaintiff's temporary TOD change ended on January 4, 2020. On January 6, 2020,

Plaintiff filed a Step 2 union grievance, listing the following "Violation" of the Master

Agreement, in part:

> **Article 17 Employee Rights**
> **Section 1 – General**
> In an atmosphere of mutual respect, all employees shall be treated fairly and equitably and without discrimination in regard to their . . . non-disqualifying handicapping conditions irrespective of the work performed or grade assigned.

In a space designated to describe "[i]n what way" that provision of the Master Agreement

was violated, the grievance states in part, "9/27/19 Management uses previously arranged

meeting to discuss change of TOD to bring up their concern over Rebekah's excessive use of

leave. A significant amount of leave used stems from their refusal to change Rebekah's TOD."

As her "Request[ed] remedy," Plaintiff lists in part,

> Reasonable accommodations
> 1) Hours of work remain the same 8am-4:30pm
> 2) Relocation to a quiet workspace-office with 1-2 occupants and the ability to close the door is ideal. . . .
> [3]] Flex schedule – if Rebekah is late or has to leave early, she can adjust schedule prn.
> [4]] Telework – Option (when needed) to telework from home Wednesdays and Fridays for data collection and other administrative tasks as needed. This may not always be needed.
> [5]] Additional breaks as needed to take medications, go to EAP or employee health.
> [6]] Unpaid time off if required to attend medical and therapy appointments for myself without fear of reprisal or retaliation. The ideal would be to use PTO (we call it leave), but I recognize that may not always be possible and want to make sure I can get the care that I need.
>
> The Union requests the grievant be made whole in every way, including all other applicable sections of the contract, laws, or regulations, any attorney and/or legal fees/expenses and any other remedy the arbitrator deems appropriate.

### f. The VA Issues its Accommodation Request Determination

Plaintiff was not offered an interim accommodation between January 4 and February 10,

2020, on which date Angarita issued an "Accommodation Request Determination" (the "RA

Determination"). The RA Determination indicates that the VA would not be providing the accommodation requested, but was offering an accommodation that they believed would be effective. Beginning on February 10, 2020, the VA offered, "You[r] tour of duty will remain 9a-5:30p. You will be allowed leave to attend scheduled [EAP] appointments, you have to submit your leave request in VATAS for all appointments. If you are going to arrive to work late, or request to leave early, you must notify your Supervisor in advance[] when leave is needed. In all case[s], proper leave procedures will need to be followed. Room 3553 will be a shared office space with you and another co-worker." Further, the form states that the accommodation will be effective because they "will allow you to complete your essential job functions as a Food Service Systems Dietitian. The accommodations help remove the limitations and restrictions exacerbating current medical condition." Finally, the form states that Plaintiff's original request for 8:00 a.m. to 4:30 p.m. TOD was denied because it "will remove the essential job functions" of an FSD and "adversely affect and create an undue hardship to the unit, patient care, and mission readiness."

Plaintiff and Angarita met that same day to discuss the RA Determination. Plaintiff asked for time to review it and if she could make a copy to show her doctor, but Angarita rejected Plaintiff's request telling her that she had to make a decision immediately. Plaintiff "sensed" that if she rejected the proposal, she would be facing termination, although Angarita never suggested as much to her. Plaintiff signed the RA Determination.

Plaintiff was hired to serve a 9:00 a.m. to 5:30 p.m. TOD, which is designed so that the FSD is present during as many meal periods as possible. The VA determined that Plaintiff's requested 8:00 a.m. to 4:30 p.m. TOD would not be an effective accommodation because it would remove the essential job functions of the FSD—including being present for the dinner

14

period—and adversely affect and create an undue hardship to the unit, patient care, and mission readiness. This specific explanation was not given to Plaintiff at that time, and she disputes that her presence was required for meals or that her absence would have adversely affected the service or created an undue hardship.

The new shared office space assigned to Plaintiff in the RA Determination was a room with four desks, although only one other person occupied the room with Plaintiff. Plaintiff, however, had no workspace or computer, and the room was being used as a storage space for files, special events material, office supplies, carts, and helium tanks. Plaintiff never informed Angarita that the room was inadequate.

### g. The VA Terminates Plaintiff's Employment

On January 21, 2020, Angarita sent to Castillo a packet of information that included a final "Proposed Disciplinary Action" memorandum dated January 15 (the "January 15 Memo"), which recommended terminating Plaintiff and listed specific instances of "Abuse of leave," "Careless or negligent workmanship," "Unauthorized disclosure of information obtained as a result of employment in the VA," "Willful resistance to supervisor's request for increased communication," and "Deliberate failure in carrying out instructions." The January 15 Memo was signed by Angarita, Dolezal, and Lewis-Rubin. Castillo was aware of Plaintiff's December 19, 2019, accommodation request.

In February 2020, HR Officer Abel Hernandez reviewed the memorandum and approved the probationary discharge. He had no knowledge of whether Plaintiff had a disability or was accommodated. On February 26, 2020, Mr. Hernandez issued a letter to Plaintiff terminating her employment "due to unsatisfactory performance and conduct." It is undisputed that HR never met with Plaintiff to discuss the identified performance issues. Plaintiff avers that the next day,

she "received a package containing a letter accusing me of poor performance and misconduct" and that "[l]isted . . . a number of claims related to my leave usage and events that were either untrue or partially untrue."

### h. Plaintiff Continues the Union Grievance Process and Initiates an EEO Complaint

Before her employment terminated, on February 13, 2020, Plaintiff submitted a Step 3 union grievance that was materially identical to her Step 2 union grievance. In a memorandum on VA letterhead dated that same day, the Deputy Medical Center Director Lori Lohar approved in part and denied in part Plaintiff's requested remedies. Ms. Lohar denied Plaintiff's "requests for relocation to a quiet workspace, additional breaks, leave without pay, and flex schedule . . . in order to allow for the interactive [reasonable accommodation ("RA")] process." The memorandum denied Plaintiff's request for telework because her "position is not telework eligible." With respect to her TOD, the memorandum states,

> You stated that you needed to pick up your child by 5:30 p.m. because the childcare center was charging you per minute if you were late to pick up your child. You stated that they closed at 5:30 p.m. Based on information obtain[ed] through the child care subsidy program, the childcare center you indicated you use does not close until 6:00 p.m. In order to accommodate your needs, the Agency is willing to change your tour of duty from 9:00 a.m. – 5:00 p.m. to 8:45 a.m. – 5:15 p.m. in order to allow 45 minutes to travel to the childcare location center from Jesse Brown. Therefore, your request to modify your schedule has been approved.

Plaintiff made initial contact with an Equal Employment Opportunity ("EEO") counselor the next day, stating that her accommodation request to change her tour was denied. Plaintiff did not invoke Step 4 of the union grievance process—arbitration.

After her employment terminated, on April 7, 2020, Plaintiff received a "Notice of Right to File a Discrimination Complaint" from the EEO. Plaintiff filed a formal complaint of discrimination. On April 24, the VA Office of Resolution Management ("ORM") sent Plaintiff a "Notice of Partial Acceptance of the EEO Complaint." In pertinent part, that Notice states,

3. EEOC Regulation 29 CFR § 1614.107(a)(4) provides for the dismissal of a complaint or a portion of that complaint that has been raised through a negotiated grievance procedure. The Commission has held that an employee cannot use the EEO complaint process to lodge a collateral attack on another proceeding. Dismissal of an EEO claim is required where complainant has already elected to pursue an allegation of discrimination under a negotiated grievance procedure that permits allegations of discrimination. A complainant elects one forum or the other by the filing date of the grievance or EEO complaint, whichever is filed earlier. In your client's complaint, she alleged that on February 7, 2020, she was denied a request to change her tour of duty as a reasonable accommodation. However, our records indicate that your client engaged in a formal step-3 grievance through the [AFGE] regarding that specific reasonable accommodation related to her tour of duty. She did not file her formal EEO complaint until April 20, 2020, after the union-grievance. Consequently, this claim is hereby <u>DISMISSED</u> pursuant to § 1614.107(a)(4) for raising the same matter in the negotiated grievance procedure.

\* \* \*

Your client's claims that are **<u>ACCEPTED</u>** for investigation are:

7. **Whether complainant was subjected to discrimination based on Disability and Reprisal when: . . .**

   **(4) On February 27, 2020, she was terminated from her probationary position.**

(Emphasis original.)

Article 43 of the Master Agreement provides that a bargaining-unit employee subjected to discrimination or an adverse action may either (1) file a grievance pursuant to the Master Agreement's negotiated grievance procedure, or (2) raise the matter under the appropriate statutory authority, but not both.

Plaintiff filed the instant lawsuit on July 13, 2021, asserting claims under the Rehabilitation Act for failure to accommodate (Count I), interference (Count II), and retaliation (Count III). (Compl., ECF No. 1.) In briefing Plaintiff withdraws her interference claim, which is accordingly dismissed. (Pl. Resp. to Def. Mot. To [*sic*] For Summary Judgment 3, ECF No. 58.)

## MOTION TO DISMISS

The Court first addresses the threshold issue of whether it has subject matter jurisdiction over Plaintiff's failure to accommodate claim. Challenges to the Court's subject matter

jurisdiction cannot be waived and can be raised at any time. *Weaver v. Hollywood Casino-Aurora, Inc.*, 255 F.3d 379, 381 (7th Cir. 2001). Plaintiff bears the burden of proving subject matter jurisdiction exists. *Apex Digital, Inc. v. Sears, Roebuck & Co.*, 572 F.3d 440, 444 (7th Cir. 2009). In deciding a Rule 12(b)(1) motion, the court "may properly look beyond the jurisdictional allegations of the complaint and view whatever evidence has been submitted on the issue to determine whether in fact subject matter jurisdiction exists." *Evers v. Astrue*, 536 F.3d 651, 657 (7th Cir. 2008) (citation omitted) (cleaned up).

Defendant argues that Plaintiff elected to pursue her reasonable accommodation claim under the negotiated grievance process set forth in the Master Agreement, and so she is bound by that irrevocable election of remedies and cannot now pursue those claims in a subsequent action. Defendant argues that this Court lacks subject matter jurisdiction because Plaintiff is precluded from pursuing her claims pursuant to the Civil Service Reform Act ("CSRA"), 5 U.S.C. § 7121(d), as well as 29 C.F.R. § 1614.301(a).

The CSRA (codified in various sections of Title 5) "elaborated a comprehensive framework for handling the complaints of civil service employees faced with adverse personnel decisions." *Ayrault v. Pena*, 60 F.3d 346, 347 (7th Cir. 1995). The CSRA was designed to establish "one integrated system for administrative and judicial review of adverse federal employee personnel actions." *United States v. Fausto*, 484 U.S. 439, 445 (1988). The Supreme Court held that alternative legal remedies are not available to federal employees for matters within the CSRA's scope. *Id*. at 448. The Seventh Circuit has interpreted this to mean that the CSRA "essentially preempted the field by superseding preexisting remedies for all federal employees." *Ayrault*, 60 F.3d at 348 (citations omitted) (cleaned up).

Under the CSRA, "An aggrieved employee affected by a prohibited personnel practice under section 2302(b)(1) of this title which also falls under the coverage of the negotiated grievance procedure may raise the matter under a statutory procedure or the negotiated procedure, but not both." 5 U.S.C. § 7121(d). Claims for employment discrimination prohibited by the Rehabilitation Act, like Plaintiff's here, fall within the scope of Section 2302(b)(1). EEOC regulations further provide that "an aggrieved employee who files a grievance with an agency whose negotiated agreement permits the acceptance of grievances which allege discrimination may not thereafter file a complaint on the same matter under this part." 29 C.F.R. § 1614.301(a). "An employee shall be deemed to have exercised his option under this subsection to raise the matter under either a statutory procedure or the negotiated procedure at such time as the employee timely initiates an action under the applicable statutory procedure or timely files a grievance in writing, in accordance with the provisions of the parties' negotiated procedure, whichever event occurs first." 5 U.S.C. § 7121(d). Finally, "Any such complaint filed after a grievance has been filed on the same matter shall be dismissed without prejudice to the complainant's right to proceed through the negotiated grievance procedure[.]" 29 C.F.R. § 1614.301(a); *see also* 29 C.F.R. § 1614.107(a)(4).

The facts that are material to this issue are not in dispute. Plaintiff was a bargaining-unit employee subject to the Master Agreement, which provides that a bargaining-unit employee who has been subjected to discrimination or an adverse action may either (1) file a grievance pursuant to the Master Agreement's negotiated grievance procedure, or (2) raise the matter under the appropriate statutory authority, but not both. *See supra* Background Section. On January 5, 2020, Plaintiff filed a Step 2 grievance through her union representative requesting accommodations due to her PTSD. She filed a Step 3 grievance on February 13, 2020. Having invoked the union's

grievance procedure, if Plaintiff was not satisfied with the decision, the next step would have been to invoke Step 4 arbitration. *See id.* Plaintiff did not do so, submitting only her EEO complaint on April 20, 2020, based on Defendant's failure to provide those same accommodations. During the EEO process, the VA's ORM recognized that Plaintiff had already filed a grievance pertaining to her requests for accommodation and dismissed those claims from her EEO complaint under 29 C.F.R. § 1614.107(a)(4). *See supra id.* Those accommodations are now the subject of Count I of the instant lawsuit.

Plaintiff nonetheless argues that her *request* for reasonable accommodations is different from her *legal claim* for Defendant's subsequent failure to accommodate. As the argument goes, although she submitted her "request" for reasonable accommodations by submitting a grievance via the negotiated grievance procedure, she did not have a cause of action under the Rehabilitation Act until Defendant later denied that request. Plaintiff does not cite a single case in support of her argument.

Plaintiff appears to assert that her grievance and EEO complaint do not concern the same "matter." *See* 29 C.F.R. §§ 1614.301(a), 1614.107(a)(4). Defendant points to *Guerra v. Cuomo*, 176 F.3d 547, 549 (D.C. Cir. 1999), in which the plaintiff, like here, filed a union grievance seeking an accommodation. *Id.* at 548. Although her employer did not accommodate her to her satisfaction, the plaintiff, like here, did not exhaust her remedies under the grievance procedures. *Id.* Four years later, she filed an EEO complaint alleging violation of the Rehabilitation Act. *Id.* The plaintiff, like here, attempted to distinguish her union grievance from her EEO complaint based on in part on the differences in the remedies she could seek in each process. To determine whether a grievance and complaint cover the same "matter," the court considered in part whether "the arbitrators assigned to handle the grievance would necessarily have needed to inquire into a

20

topic in discharging their duties[.]" *Id*. at 550. The court found that for the plaintiff's arguments "to suffice to distinguish the 'matter' covered in her grievance from that in her EEO complaint would mean that an employee could simply formulate an EEO complaint on the basis of dissatisfaction with the results of the grievance process," which was the precise result that the election of remedies in Section 7121(d) was meant to avoid. *Id*. at 550. Here as well, resolution of Plaintiff's grievance would necessarily have required inquiry into the same accommodation requests raised later in the EEO complaint, as well as Defendant's responses to them over the several months prior.

Further, Plaintiff's January 6, 2020, grievance cannot be fairly characterized as a mere initial "request" for reasonable accommodation in the sense that Plaintiff suggests. Plaintiff argues on summary judgment that she first made a request for reasonable accommodation on September 27, 2019—the timing of which is material to whether Plaintiff made a reasonable accommodation request before her supervisor recommended termination. Plaintiff cannot have it both ways. Inferring these facts in her favor for summary judgment purposes, Plaintiff verbally made a reasonable accommodation request on September 27, 2019, then renewed that request in writing on December 19, then filed her union grievance on January 6, 2020, two days after the temporary period for the reasonable accommodation she sought had expired. Under Plaintiff's version of events, the parties had been engaged in discussions regarding her request for reasonable accommodation for months before she filed a union grievance.

Because Plaintiff's EEO complaint involves the same "matter" as her previously submitted union grievance, Count I is dismissed without prejudice to her right to proceed through the negotiated grievance procedure. *See Tucker v. Astrue*, 738 F. Supp. 2d 835, 839

(N.D. Ill. 2010); *Wong v. Barnhart*, No. 05 C 5681, 2006 WL 1719530, at *2 (N.D. Ill. June 19, 2006); *Steadman v. Whitman*, No. 01 C 6699, 2002 WL 31473823, at *7 (N.D. Ill. Nov. 1, 2002).

## MOTION FOR SUMMARY JUDGMENT

Having dismissed Count I for lack of subject matter jurisdiction and Count II because it was withdrawn by Plaintiff, the Court declines to address the summary judgment motion that goes to the merits of those claims. The Court does proceed to consider whether summary judgment is appropriate on Plaintiff's retaliation claim (Count III). For the reasons set forth below, summary judgment is granted on Count III in Defendant's favor.

### A. LEGAL STANDARD

Summary judgment shall be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). When considering a motion for summary judgment, the Court must construe the evidence and make all reasonable inferences in favor of the non-moving party. *Hutchison v. Fitzgerald Equip. Co., Inc.*, 910 F.3d 1016, 1021 (7th Cir. 2018). Summary judgment is appropriate when the non-moving party "fails to make a showing sufficient to establish the existence of an element essential to the party's case and on which that party will bear the burden of proof at trial." *Celotex v. Catrett*, 477 U.S. 317, 322 (1986). In other words, failure to support any essential element of a claim renders all other facts immaterial. *Id.* at 323. "A genuine issue of material fact arises only if sufficient evidence favoring the nonmoving party exists to permit a jury to return a verdict for that party." *Brummett v. Sinclair Broad. Grp., Inc.*, 414 F.3d 686, 692 (7th Cir. 2005). "Material" means that the factual dispute must be outcome-determinative under governing law. *Contreras v. City of Chicago*, 119 F.3d 1286, 1291 (7th Cir. 1997).

**B. DISCUSSION**

The Rehabilitation Act makes it unlawful to retaliate for the exercise of rights conferred by that statute. *Stanek v. St. Charles Cmty. Unit Sch. Dist. No. 303*, 783 F.3d 634, 641 (7th Cir. 2015). The parties rely upon authority interpreting Title VII, which is consistent with the approach in this Circuit to analyze retaliation claims brought under the Rehabilitation Act under the same framework as Title VII retaliation claims. *Burks v. Wisconsin Dep't of Transp.*, 464 F.3d 744, 758 n.16 (7th Cir. 2006). Accordingly, this Court does so as well.

 "A retaliation claim requires proof that the plaintiff suffered an adverse employment action because of his statutorily protected activity; in other words, the plaintiff must prove that [1] he engaged in protected activity and [2] suffered an adverse employment action, and that [3] there is a causal link between the two." *Lord v. High Voltage Software, Inc.*, 839 F.3d 556, 563 (7th Cir. 2016). The "legal standard . . . is simply whether the evidence would permit a reasonable factfinder to conclude that the plaintiff's race, ethnicity, sex, religion, or other proscribed factor caused the discharge or other adverse employment action." *Ortiz v. Werner Enters., Inc.*, 834 F.3d 760, 765 (7th Cir. 2016). "Typical kinds of evidence used for this purpose include (1) ambiguous statements or behavior towards other employees in the protected group; (2) evidence, statistical or otherwise, that similarly situated employees outside of the protected group systematically receive better treatment; and (3) evidence that the employer offered a pretextual reason for an adverse employment action." *Morgan v. SVT, LLC*, 724 F.3d 990, 995-96 (7th Cir. 2013) (citation omitted) (internal punctuation omitted). The Seventh Circuit has removed the "rat's nest of surplus 'tests'" once utilized in employment discrimination cases in this circuit and held that "[e]vidence must be considered as a whole, rather than asking whether any particular piece of evidence proves the case by itself—or whether just the 'direct' evidence

23

does so, or the 'indirect' evidence. . . . All evidence belongs in a single pile and must be evaluated as a whole." *Ortiz*, 834 F.3d at 765-66.

There is no dispute that Plaintiff's termination constitutes an adverse employment action. Rather, the parties' disagreement lies in the first and third elements.

### a. Protected Activity

Defendant argues that Plaintiff first engaged in protected activity when she submitted her written request for a reasonable accommodation on December 19, 2019. Plaintiff contends that a reasonable factfinder could determine that she engaged in protected activity as early as the September 27, 2019 meeting, during which she renewed her September 5 request for a change in her TOD. Plaintiff declares by affidavit that she explained during the September 27 meeting the mental health crisis that she was experiencing due to her son's condition and the domestic violence she was experiencing, how it was impacting her at home and at work, and that she was seeking professional help. Union steward Ferguson, who attended the meeting, declares the same. Plaintiff cites no authority in support of the proposition that this constitutes protected activity. Nonetheless, requesting accommodations for a disability is protected activity. *Cloe v. City of Indianapolis*, 712 F.3d 1171, 1180 (7th Cir. 2013), overruled on other grounds by *Ortiz*, 834 F.3d 760.

Angarita, however, declares that Plaintiff only discussed her son's medical conditions and difficulties with his childcare due to scheduling and her financial situation, and that she was separated from her husband. Angarita maintains that Plaintiff did not raise the domestic violence or personal medical issues she was experiencing, and that Plaintiff did not say that she was seeking treatment for mental health issues. Angarita swears that she was not aware of Plaintiff's disability or any request for accommodation until December 19, 2019. The timing of Plaintiff's

reasonable accommodation request matters because if Plaintiff did not make it until December 19, 2019, Angarita had no knowledge of it when she recommended termination three days prior.

Even if a factfinder were to find in Plaintiff's favor that Plaintiff requested a reasonable accommodation at the September 27, 2019 meeting, however, Plaintiff fails to present sufficient evidence that any protected activity caused her employment termination for the reasons set forth in the next section. The Court declines to consider whether Plaintiff improperly attempts to retroactively amend her pleading at summary judgment.

### b. Causation

"A plaintiff demonstrates a causal connection by showing that the defendant 'would not have taken the adverse action but for [his] protected activity.'" *Baines v. Walgreen Co.*, 863 F.3d 656, 661 (7th Cir. 2017) (quoting *Greengrass v. Int'l Monetary Sys. Ltd.*, 776 F.3d 481, 486 (7th Cir. 2015)) (internal punctuation omitted). Plaintiff does not rely on direct evidence of unlawful animus, pointing instead to purportedly "circumstantial evidence from which a jury may infer intentional discrimination." *Id*. (citation omitted). "If a plaintiff can assemble from various scraps of circumstantial evidence enough to allow the trier of fact to conclude that it is more likely than not that discrimination lay behind the adverse action, then summary judgment for the defendant is not appropriate." *Id*. (citation omitted) (cleaned up).

Plaintiff argues that the suspicious timing of certain facts supports an inference of discriminatory intent. Suspicious timing can serve as circumstantial evidence of discrimination, although that alone is typically not enough. *Stone v. City of Indianapolis Pub. Utils. Div.*, 281 F.3d 640, 644 (7th Cir. 2002). Plaintiff concedes that "mere temporal proximity between the filing of the charge of discrimination and the action alleged to have been taken in retaliation for that filing will rarely be sufficient in and of itself to create a triable issue." *Id*. (listing cases).

25

"The reason is obvious: suspicious timing may be just that—suspicious—and a suspicion is not enough to get past a motion for summary judgment." *Kidwell v. Eisenhauer*, 679 F.3d 957, 966 (7th Cir. 2012) (citation omitted) (cleaned up). "For an inference of causation to be drawn solely on the basis of a suspicious-timing argument, [courts] typically allow no more than a few days to elapse between the protected activity and the adverse action." *Id.* (citation omitted).

Plaintiff first points out that only 38 days passed between the September 27, 2019, meeting and the day Angarita "began retaliating" against Plaintiff by issuing the November 4, 2019, letter of counseling. The letter of counseling itself does not rise to the level of an adverse employment action. *Jones v. Res-Care, Inc.*, 613 F.3d 665, 671 (7th Cir. 2010) ("[U]nfair reprimands or negative performance evaluations, unaccompanied by some tangible job consequence, do not constitute adverse employment actions." (citing *Grube v. Lau Indus., Inc.*, 257 F.3d 723, 729 (7th Cir. 2001) (internal punctuation omitted)); *Cole v. Illinois*, 562 F.3d 812, 816 (7th Cir. 2009) (placing plaintiff on an "employee improvement plan" that required him to submit daily and weekly schedules to supervisors was not an adverse action for a FMLA retaliation claim, a "similar context [to] Title VII claims"). There is no dispute that Plaintiff's termination constitutes an adverse employment action, which occurred on February 26, 2020— 152 days, or about five months, after the September 27, 2019 meeting.[2] Angarita proposed Plaintiff's termination on December 16, 2019—about 80 days after the September 27 meeting (and three days before Angarita learned of Plaintiff's PTSD diagnosis). These gaps in time are

---

[2] Defendant addresses various other actions alleged in Plaintiff's complaint to be adverse employment actions. Because Plaintiff does not respond or otherwise address them on summary judgment, she has waived any lines of argument as to those other alleged actions. *C & N Corp. v. Gregory Kane & Ill. River Winery, Inc.*, 756 F.3d 1024, 1026 (7th Cir. 2014) (finding that failure to make an argument in response to a motion for summary judgment constituted waiver); *Bonte v. U.S. Bank, N.A.*, 624 F.3d 461, 466 (7th Cir. 2010) ("Failure to respond to an argument . . . results in waiver.").

simply too long to support an inference of retaliation, without more. *Sklyarsky v. Means-Knaus Partners, L.P.*, 777 F.3d 892, 898 (7th Cir. 2015) (six months between protected activity and adverse employment action was insufficient to support inference of causation); *Kidwell*, 679 F.3d at 967 (finding five weeks insufficient).

Plaintiff nonetheless points to *Lang v. Illinois Department of Child. & Family Services*, 361 F.3d 416, 419 (7th Cir. 2004), in which the court found the timing of an employee's discipline for performance and unfounded attendance violations that began within fourteen days after he filed a union grievance about a racially discriminatory practice, and then increased in frequency and intensity immediately after the plaintiff filed a charge of discrimination with the EEOC, to be "extremely suspicious." There, the "extremely short lapse of time between [plaintiff's] complaints and the increased discipline he faced, the baseless attendance violations, evidence that [his supervisor] was holding him to unrealistic standards, and his previous five-year flawless employment record raise the inference of causation." *Id.* at 421.

Plaintiff compares this case to *Lang* and argues that the timing of certain events between the September 27 meeting and her termination are sufficiently suspicious when viewed together. In her brief, Plaintiff simply lists a handful of purported facts, without explaining how they hang together to show retaliatory animus: Angarita learned of Plaintiff's mental health crisis and associated treatment on September 27, 2019, when Plaintiff renewed her request for a TOD change; a little over a month later, on November 4, Angarita issued the letter of counseling regarding Plaintiff's excessive use of leave, its adverse impact upon their service, and warning that lack of improvement in leave usage could lead to Plaintiff's termination; over a month later, Angarita sent an email to Dolezal recommending termination the same day Plaintiff told Angarita that she had a doctor's appointment; about eight weeks earlier, Angarita had designated Plaintiff

to act as substitute FOM for four days, and about six weeks earlier, Angarita had rated Plaintiff as fully successful on Plaintiff's performance review (for the period of June 9, 2019, to September 30, 2019); Dolezal indicated that she was previously unaware that Angarita was planning to recommend Plaintiff's termination[3]; Plaintiff's supervisors did not contact Castillo until over a month later to request Plaintiff's termination; Angarita approved the majority of Plaintiff's requested leave[4]; it is disputed as to whether the termination decision was based in part upon several false or misleading allegations by Plaintiff's superiors; and Plaintiff was terminated only 16 days after the VA issued its RA Determination.[5]

As best the Court can surmise, Plaintiff appears to suggest that her performance was considered wholly satisfactory—so much so that Plaintiff was given managing responsibilities on several occasions—up until Angarita's December 16 termination proposal, which was based on leave usage that Angarita had approved and in part on false accusations of performance issues, and which came out of the blue the same day Plaintiff had a doctor's appointment.

---

[3] Plaintiff takes some liberty with the statements that Dolezal made in her email to Angarita. *See supra* Background Section. A factfinder may nonetheless be able to reasonably infer from Dolezal's statements that she was previously unaware of Angarita's recommendation.

[4] Plaintiff also states that on February 10, 2020, Angarita told Plaintiff to use leave as an accommodation for her disabilities but then accused her of leave abuse. But Plaintiff misstates the February 10 RA Determination. *See supra* Background Section. A factfinder may not reasonably infer from the requirement to follow "proper leave procedures" that leave was granted as a reasonable accommodation.

[5] Plaintiff's brief references only a February 26, 2020 removal letter signed by Angarita, Dolezal, and Rubin-Lewis containing several false or misleading allegations by those superiors, but such a letter does not exist in the record. The Court infers in Plaintiff's favor that Plaintiff intends to refer to the January 15 Memo that Angarita sent to Castillo on January 21, 2020—which HR Officer Hernandez then reviewed before approving Plaintiff's probationary discharge and sending to Plaintiff a termination letter on February 26, 2020. As set forth in the Background section above, most of the events listed on the January 15 Memo, as well as Plaintiff's leave usage, are not disputed.

Plaintiff seems to contend that this supports an inference of retaliation for Plaintiff requesting a reasonable accommodation 80 days earlier.

Plaintiff does not provide the full picture of the undisputed facts, leaving out out those showing the 100-plus hours that she was on leave during the first six months she worked at the Medical Center. Plaintiff also leaves out the multiple instances between September and December when Angarita held conversations with Plaintiff, and authored contemporaneous (or near contemporaneous) reports of contact, regarding incidents where Plaintiff failed to carry out her job duties. "Where a significant intervening event separates an employee's protected activity from the adverse employment action he receives, a suspicious-timing argument will not prevail." *Kidwell*, 679 F.3d at 967 (citation and internal punctuation omitted). During the three-month period in which Plaintiff's TOD was temporarily changed to 8:00 a.m.-4:30 p.m.—the reasonable accommodation requested by Plaintiff—she nonetheless took 53.45 hours of leave and continued to fail to perform certain job duties. Plaintiff was expressly terminated from her position "for failure to meet the requirements for satisfactory service" and "due to unsatisfactory performance and conduct" based on Plaintiff's excessive leave usage and the incidents listed in the January 15 Memo—the majority of which are undisputed, and only one of which occurred during the review period for which Plaintiff received positive ratings. Plaintiff does not claim that the reasons for terminating her employment were a pretext for retaliation.

These undisputed facts reveal that this case is unlike *Lang, supra*, because there is no evidence of or akin to unfounded attendance violations or unrealistic standards beginning immediately after protected activity and for the first time in a five-year flawless employment record. The Court also finds this case to be distinguishable from *Bidani v. McDonough*, where the plaintiff's supervisor admitted that she made the decision to recommend termination during a

meeting at which the plaintiff complained of the supervisor's disability-related harassment, and the discharge letter was prepared two days after its author learned the plaintiff had filed a charge of discrimination with the employment-rights office. No. 22-1534, 2023 WL 2424065, at *3 (7th Cir. Mar. 9, 2023). "Where, as here, there are reasonable, non-suspicious explanations for the timing of [the plaintiff's] termination—namely, [excessive absences and failing to carry out job responsibilities—the court] will not deny summary judgment solely on the strength of this one point." *Morgan*, 724 F.3d at 998.

At the summary judgment stage, a party cannot rely on allegations; she must put forth evidence. Fed. R. Civ. P. 56(c)(1)(A). "As the 'put up or shut up' moment in a lawsuit,' summary judgment requires a non-moving party to respond to the moving party's properly-supported motion by identifying specific, admissible evidence showing that there is a genuine dispute of material fact for trial." *Grant*, 870 F.3d at 568. Plaintiff fails to put forth sufficient evidence that there is a triable fact as to whether any protected activity caused her termination. *See Overly v. KeyBank Nat. Ass'n*, 662 F.3d 856, 863 (7th Cir. 2011) ("The record is simply void of the bits and pieces of circumstantial evidence necessary to establish a causal link between [the protected activity] and [the employer's] conduct."). Accordingly, Defendant's motion for summary judgment is granted as to Plaintiff's retaliation claim.

## CONCLUSION

Defendant's motion to dismiss Count I for lack of subject matter jurisdiction [65] is granted. Count II is withdrawn by Plaintiff and is therefore also dismissed. Finally, Defendant's motion for summary judgment [45] is granted on Count III, which is also dismissed. Civil case terminated.

SO ORDERED.                                      ENTERED: August 22, 2023


**HON. JORGE ALONSO**
**United States District Judge**